IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

WOOYOUNG CHUNG,           )     CASE NO.: 1:13 CV 1354
                                 )
          Plaintiff,      )     JUDGE DONALD C. NUGENT
                                 )
v.                        )
                               )     <u>MEMORANDUM OPINION</u>
RONALD M. BERKMAN, *et al.*,   )
                               )
          Defendants.     )

This matter is before the Court on the Motion of Defendant Cleveland State University ("CSU") for summary judgment. (ECF #64).  For the reasons that follow, Defendant's Motion for Summary Judgment (ECF #64) is granted.

## **FACTS**

Pro se Plaintiff WooYoung Chung filed this action against Defendant Cleveland State University ("CSU") under Title VII, 42 U.S.C. § 2000e *et seq*, alleging discrimination and retaliation based upon his race or national origin.[1]

Plaintiff was hired by CSU on January 10, 2011, as the Manager of Systems and Data Analysis in the Division of Enrollment Services. (Complaint, ¶31.) Plaintiff's position was a

---

[1]

Plaintiff describes himself as Asian. (Complaint, ¶31.)   Plaintiff's Complaint originally included 17 individual employees of CSU as Defendants, however the Court granted Defendants' Motion to Dismiss the individual defendants on August 26, 2013. (ECF #11) Accordingly, the only claims remaining before the Court are Plaintiff's Title VII discrimination and retaliation claims against Defendant CSU.

bargaining unit position with the Service Employees International Union ("SEIU") and included a probationary period. *Id.* According to the SEIU contract, an employee may be discharged for any reason during the probationary period and such discharge is not subject to the grievance procedure. (ECF #64, Ex. 1, 3) Plaintiff's job duties and functions included, among other things, gathering data and analysis, primarily through data base systems, to be used by the Division of Enrollment Services for strategic purposes. (Complaint, ¶¶ 31-32; ECF #64, Ex.4)  At the time of his hiring, Plaintiff reported to Dr. Corinne Webb, the interim Vice President of Enrollment Services. On August 1, 2011, Carmen Brown was hired as the Vice President of Enrollment Services taking over all of Dr. Webb's duties, including supervising Plaintiff. (Complaint ¶31, Brown Aff. ¶3).

Shortly after beginning his job at CSU, Plaintiff developed a computer application, known as the "Dashboard," to perform certain data gathering and analysis related to student enrollment, performance, and retention. (Complaint ¶¶ 37-39) In addition to Dashboard, Plaintiff was also assigned to oversee the design and implementation of two programs purchased from outside vendors. (Id. at ¶36) When these two outside programs were ready to interface with the CSU central database, the actual coding tasks were assigned to two Caucasian employees from the Information Services and Technology Department. (Id. at ¶¶ 40-41, 42-44). Plaintiff asked to be assigned to those tasks but alleges that Judy Richards, the Director of the Department of Audits, directed that the request be denied.

In the Spring of 2011, Michael Holstein, CSU's Manager of Data and Network Security ("IS&T"), became aware while performing routine data base logs, that the Dashboard was requesting massive amounts of student data from PeopleSoft, an Oracle database that CSU uses

2

to maintain student information, including confidential student information such as ID numbers, grades and social security numbers. (Holstein Aff. ¶¶ 1-5).  Mr. Holstein reported his findings to Judy Richards and compiled a report (the "Technical Summary") concerning the security concerns regarding the Dashboard. (ECF #64, Ex. 8; Holstein Aff. ¶8) Virtually all application development using access to PeopleSoft is performed within IS&T or the Institutional Research department ("IR") in order to control data security. (Richards Aff., ¶4). Enrollment Services is not within either IS&T or IR.

A meeting was held on May 13, 2011, to discuss the Dashboard security concerns raised in the Technical Summary.  At the meeting, CSU's internal auditors Judy Richards and John Petrus raised their concerns about the Dashboard to Plaintiff and Dr. Webb.  Plaintiff asserted that their concerns were not valid. Ms. Richards asked Plaintiff to complete a security checklist to ensure sensitive information was protected. (Richards Aff. ¶9). Plaintiff asserts that he expressed his disappointment at being excluded from the coding tasks for the other two programs and asked that formal standards be instituted for developing computerized systems and that they be applied uniformly to everyone whose duties included developing a system.[2]

---

[2]

The Court has significant difficulty when attempting to incorporate Plaintiff's assertions as his filings do not comport with the Federal or Local rules of Civil Procedure.  Plaintiff has filed as Exhibit 1 to his Response what can only be described as a second brief or a 51 page unsworn, unsigned declaration in opposition to Defendant's Motion for Summary Judgment. Even if the filing were in an admissible form, it flagrantly exceeds the page limit set by the Local Rules.  In addition to the improper Exhibit 1, Plaintiff attaches an additional 45 Exhibits to his filing, none of which is properly authenticated or admissible. As such, Defendant has objected to all of the Exhibits attached to Plaintiff's Response because none of them are properly authenticated or admissible. Moreover, CSU argues, correctly, that Exhibit 1 to Plaintiff's Response is an unsigned and unsworn statement that is not competent summary judgment evidence. In a belated effort to rescue his improper filings, Plaintiff filed "Supplmental [sic] Declarations" (ECF #71) in an attempt to authenticate his earlier Exhibits and statements. CSU moves to strike

After that meeting, Plaintiff, Ms. Richards, Mr. Petrus and Mr. Holstein engaged in a series of email communications about making changes to Dashboard to increase its security. CSU asked Plaintiff to complete a security checklist for the Dashboard. (Richards Aff. ¶11). The security checklist that Plaintiff was asked to complete is the same checklist that all developers of internal and external software applications that handle or host CSU's data, including student data, are asked to complete. (Id. at ¶12). Plaintiff provided the first version of the security checklist to Ms.Richards on August 17, 2011. That security checklist did not contain sufficient information to alleviate the security concerns that Ms. Richards had about the Dashboard so Richards arranged a meeting on August 23, 2011 to discuss the security concerns. (Id. ¶¶13-16)

The August 23, 2011 meeting was attended by Ms. Richards, Plaintiff and his supervisor Carmen Brown, Mr. Holstein, CSU's Chief Information Officer William Wilson, and other CSU employees. At that meeting Ms. Richards distributed a list of concerns that the Audit Department had with the Dashboard. The focus of the meeting was to ensure that the Dashboard complied with CSU's security requirements. (Id. ¶¶16-17). Plaintiff believes that the concerns expressed by the Audit Department were unfounded and that the handout contained false

---

Plaintiff's Supplemental Declaration (ECF #72) on the grounds that it was filed out of rule and without leave of Court and should thus be disregarded. Moreover, CSU argues that the Supplemental Declaration does not cure the defects that exist in Exhibit 1, which merely sets forth argument and conjecture, not facts based upon personal knowledge. While the Court is aware of Plaintiff's *pro se* status, Rule 56 requires *pro se* litigants to support factual assertions with admissible evidence via sworn affidavits or declarations made under penalty of perjury. *Moore v. Warden*, 2013 U.S. Dist. LEXIS 20378 (Feb. 17, 2012); *Bass v. Wendy's of Downtown, Inc*., 526 Fed. Appx. 599, 601 (6th Cir. 2013)("*pro se* litigants are treated no differently than litigants who choose representation by attorneys.") The Court has made an attempt to glean admissible information from Plaintiff's filings. Defendant's motion to strike the supplemental declaration (ECF #72) is denied.

4

allegations about Plaintiff and the Dashboard.[3] Both Ms. Richards and Ms. Brown assert that during the August 23 meeting, no one made personal accusations of wrong doing against Plaintiff. (Id. ¶ ; Brown Aff. ¶9) On August 25, 2011, CSU decided to take down the Dashboard until CSU, as an institution, could complete the security checklist to the satisfaction of Ms. Richards. (Brown Aff. ¶12)

On August 25, 2011, Plaintiff met with Director of Affirmative Action, Maria Codinach who served as the Equal Employment Opportunity Investigator for the University. He apparently felt that the security concerns about the Dashboard expressed by Ms. Richards at the August 23 meeting, along with the handout constituted an adverse employment action, and complained that it was retaliation for his opposing discriminatory audit practices. He also complained that Janet Stimple, the University Registrar, excluded him from the "OnBase" project, while two white employees worked on the project.

On June 5, 2011, Plaintiff applied for the position of Director of IR at CSU. (Complaint, ¶58). Janet Stimple, the University Registrar, chaired the search committee for this position. (Stimple Aff. ¶9) After the application period closed, the search committee reviewed all of the submissions to eliminate any applicants who did not meet the minimum qualifications. By June 17, 2011, the committee had determined that based upon Plaintiff's application materials, Plaintiff failed to meet two of the minimum qualifications for the job and he was eliminated from contention for the position. (Id. ¶¶11-13) The search committee did, however, recommend that CSU interview three Asian applicants for the position who they determined met the minimum

---

[3] The Court was unable to discern any allegation, negative or otherwise, concerning Plaintiff in either handout identified by Plaintiff.

qualifications.(ECF #64, Ex. 34 and Ex.35)

After the Dashboard project was shut down, Ms. Brown noticed that Plaintiff's work performance deteriorated.  Among other things, he stopped running routine reports for the Division of Enrollments that were specifically requested by his supervisor Brown. (Brown Aff. ¶13) After a number of ongoing performance issues, Plaintiff received a negative probationary employment review from Ms. Brown on November 29, 2011. (ECF #64, Ex. 21).

A week before his negative review, Plaintiff filed a formal complaint with the Affirmative Action Office of CSU on November 23, 2011.  Plaintiff complained that the following incidents were discriminatory and retaliatory:

–False Accusation of CSU Data Security Breach (Aug. 23, 2011)

–Intimidation to submit to search or lose the data access (Aug. 25, 2011)

–Rejection of Application for the Director of IR Position (Sept. 13, 2011)

–False accusation about Gone but not Forgotten (Oct. 6, 2011)

–Threat to remove the database access (Oct. 20, 2011)

–False accusation of delaying the Cohort Certification (Oct. 24, 2011)

–Threat to remove manager title–work more than 40 hours (Oct. 25, 2011)

–False accusation of failure to do due diligence (Oct. 26, 2011)

–Setting up to fail with unrealistic work demands (Oct. 28, 2011)

–Extension of probationary period (Nov. 9, 2011)

Following his negative review, on December 4, 2011, Plaintiff submitted an addendum to his discrimination complaint alleging that Brown's evaluation was unlawful retaliation against Plaintiff's protected activity. (ECF #69, Ex.6) Plaintiff filed a second addendum to his

discrimination complaint on December 12, 2012. (ECF #69, Ex.7) Donna Whyte, the Acting

Director of Affirmative Action conducted an investigation of Plaintiff's complaints and issued

her report on January 4, 2012, finding that none of actions complained of were based on

discrimination or retaliation. (ECF #64, Ex. 28)

Following his November evaluation, Ms. Brown noted that Plaintiff continued to have

on-going performance issues including delaying transfer of the Dashboard to IR as requested;

continued failure to provide Ms. Brown with reports in the format requested and with the

information she requested; and his inability to provide Ms. Brown with the specific enrollment

statistics that she needed upon request. (Brown Aff., ¶24-26)  On February 9, 2012, Plaintiff was

terminated from his position of Manager, Systems and Data Analysis for unsatisfactory

performance during his probationary period.

On February 20, 2012, Plaintiff applied for the position of Assistant Director of

Technology Operations at Cleveland-Marshall College of Law. (Complaint, ¶128) Kristina

Niedringhaus, the Director of the Law Library, was the hiring manager for this position.

(Niedringhaus Aff., ¶2) Plaintiff was invited for, and attended, a full day interview for the

position. Of the five candidates interviewed, every member of the search committee ranked

Plaintiff as either last or second to last. (ECF #64, Ex.40) While Plaintiff was qualified for the

position, the search committee determined that Daniel Thomas was the best fit for the position

based upon a number of factors, most importantly of which was his performance during the

interview. (Niedringhaus Aff., ¶11) Mr. Thomas was also unanimously rated as the top candidate

for the position by the search committee. (ECF #64, Ex. 40) Plaintiff was notified on May 14,

2012, that he did not get the Assistant Director position.

7

Plaintiff filed his charge with the Ohio Civil Rights Commission on May 24, 2012.

(Complaint, ¶29; ECF #64, Ex.41)

## STANDARD OF REVIEW

Summary judgment is appropriate when the court is satisfied "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." FED. R. CIV. P. 56©.  The burden of showing the absence of any such "genuine issue"

rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of
> informing the district court of the basis for its motion, and identifying those portions
> of 'the pleadings, depositions, answers to interrogatories, and admissions on file,
> together with affidavits, if any,' which it believes demonstrates the absence of a
> genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56©).  A fact is "material"

only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires

consideration of the applicable evidentiary standards.  The court will view the summary

judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of their case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "[t]he mere existence of

a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57

8

F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).  Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citations omitted).  In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.  However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover.  The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate.  *Id.*

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible.  The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'"  *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181

(9th Cir. 1988)).  Fed. R. Civ. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify.  Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit.  Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted).  However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id*. at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

10

**ANALYSIS**

Plaintiff asserts 12 counts for relief under Title VII against CSU. Specifically, Plaintiff asserts claims of discrimination (disparate treatment) and retaliation based upon the following:

(1)  a "falsified performance document" the November 29, 2011 performance review (Counts I and II);

(2)  his "wrongful termination" (Counts V and VI);

(3) Failure to Hire for the Assistant Director of Technology Operations at the law school (Counts IX and X);

(4) "False Accusations" made at the August 23, 2011 Dashboard meeting (Counts XIII and IX);

(5) Failure to Promote or hire for the Director of IR (Counts XVII and XVIII); and

(6)  Retaliatory or Discriminatory Harassment (Counts XXI and XXII).

Defendant asserts that it is entitled to summary judgment on Plaintiff's claims because Plaintiff cannot prove a prima facie case of discrimination or retaliation. Further, even if Plaintiff could establish any prima facie case, CSU has articulated  legitimate, non-discriminatory and non-retaliatory reasons for its actions and Plaintiff has failed to demonstrate any evidence of pretext. Finally, CSU asserts that Plaintiff's claims for discriminatory and retaliatory harassment fail because there is no evidence of severe and pervasive harassment. The Court will consider these arguments in order.

**1.  Discrimination Claims**.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of

11

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  In this case, Plaintiff alleges the following instances of disparate treatment based on his race: (1) his November 29, 2011 negative performance review; (2) his termination; (3) CSU's failure to hire him for the law school assistant director of technology position; (4) the alleged false accusations made during the August 23, 2011 Dashboard meeting; and (5) CSU's failure to hire him (or promote) him to the Director of IR position.

In cases such as this where there is no direct evidence of discrimination, a plaintiff may still prove a claim of discrimination using indirect and circumstantial evidence. Such claims are analyzed under the familiar burden-shifting framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this analysis, if a plaintiff establishes a prima facie case of discrimination, the plaintiff "receives the benefit of a presumption that the employer unlawfully discriminated against him." *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004) (citing *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The burden then shifts to the defendant-employer "to articulate some legitimate, nondiscriminatory reason" for the employment action in question. *McDonnell Douglas*, 411 U.S. at 802. Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. The ultimate burden of establishing that discrimination occurred remains with the plaintiff throughout the analysis. *Id*.

A plaintiff may establish a prima facie case of race discrimination under Title VII by

12

"demonstrating (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a similarly-situated employee outside the protected class or classes was treated more favorably than he." *Dodd v. Donahoe*, 715 F.3d 151, 156 (6th Cir.2013) (quotation omitted). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253.

Defendant argues that Plaintiff has not demonstrated a prima facie case for his discrimination claims involving CSU's evaluative comments – *i.e.*, the November 29, 2011 negative performance review (Count II) and the alleged false accusations made at the August 23, 2011 Dashboard meeting (Count XIV) because Plaintiff has failed to establish the second and fourth elements of the prima facie case in that he has failed to demonstrate that he suffered an "adverse employment action" or that a similarly-situated employee outside the protected class or classes was treated more favorably than him.

Plaintiff contends that both the negative review which was cited as the reason for his termination and the alleged accusations made at the August 23 Dashboard meeting constitute adverse employment actions.  The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms and conditions of [plaintiff's] employment because of [the] employer's conduct." *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir.2004) (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999)); *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir.1996). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Hollins*, 188 F.3d at 662. "Examples of adverse employment actions include firing, failure to promote, reassignment with significantly lower responsibilities, a material loss

13

of benefits, suspensions, and other indices unique to a particular situation." *Smith*, 378 F.3d at 575–76, (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998))

In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), in the context of a retaliation claim, the Supreme Court took an expansive view of the type of conduct that qualified as materially adverse: "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 71, 126 S.Ct. 2405 (internal quotation omitted). While the Court noted that "trivial harms" did not receive protection, the Court explained that it phrased the standard in general terms "because the significance of any given act of retaliation will often depend on the particular circumstances." *Id.* at 69, 126 S.Ct. 2405. *See Halfacre v. Home Depot, U.S.A., Inc*., 221 Fed.Appx. 424, 432 (6th Cir.2007). Thus, for example a "[s]upervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Burlington*, 548 U.S. at 69, 126 S.Ct. 2405 (citing 2 EEOC 1998 Manual § 8, p. 8–14.)

Applying this rather inclusive interpretation of "materially adverse" to performance appraisals, the Sixth Circuit has held that: "[i]f the Supreme Court views excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement as materially adverse conduct, see *Burlington*, 126 S.Ct. at 2415–16, then markedly

14

lower performance-evaluation scores that significantly impact an employee's wages or professional advancement are also materially adverse." *Halfacre*, 221 Fed.Appx. at 433. See, e.g., *White v. Baxter Healthcare Corp*., 533 F.3d 381, 403 (6th Cir.2008) ("By receiving a lower salary increase than he would have without the more negative evaluation, White was denied an increase in pay to which he allegedly was entitled. Under our precedent, such a deprivation of increased compensation does constitute an adverse employment action.") See *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir.2007) (While "a negative performance evaluation does not [alone] constitute an adverse employment action," it can if "the evaluation has an adverse impact on an employee's wages or salary."); *James v. Metro. Gov't of Nashville*, 243 Fed.Appx. 74 (6th Cir.2007). But see *Novotny v. Elsevier Reed*, 291 Fed.Appx. 698, 703 (6th Cir.2008) (applying pre-*Burlington* authority to find that providing greater scrutiny of an employee's calendar, requiring the employee to submit self-evaluations earlier than her co-workers, and placing her on a performance plan did not constitute adverse actions).

In the wake of *Burlington*, courts have also considered poor performance appraisals that form the basis of an eventual dismissal to be materially adverse. See, e.g., *Tuttle*, 474 F.3d at 323 ("[D]istrict court could have found that the unfavorable job performance appraisals [...] likely resulted in both [plaintiff] transfer [...] and, later on, her termination from employment."); *Keys v. Humana, Inc*., 2010 WL 2961186, at *3, 2010 U.S. Dist. LEXIS 75096, at *8 (W.D.Ky. July 23, 2010) (properly supported allegation that downgraded evaluation eventually resulted in discharge was sufficient to make out an adverse action); *Reitz v. City of Mt. Juliet*, 2009 WL 5170200, at *6, 2009 U.S. Dist. LEXIS 118170, at *20 (M.D.Tenn. Dec. 18, 2009) ("reprimands led directly to Reitz's suspension [..] and to her eventual termination"). See *Bacon v. Honda of*

15

*Am. Mfg., Inc*., 192 Fed.Appx. 337, 344 (6th Cir.2006) (negative evaluations that are used to support a discharge can be considered adverse employment actions).

In this case, Plaintiff's Order of Termination (ECF #64, Ex. 27) cites that the reason for his termination "is that you have demonstrated unsatisfactory performance during your probationary period, as reflected in the performance-related document dated November 29, 2011."  As such, this negative evaluation used to support his discharge can be considered an adverse employment action.  There is no evidence however, that any alleged accusations made during the August 23, 2011 meeting caused a significant change in Plaintiff's benefits, or led to Plaintiff's discharge. As such Plaintiff fails to demonstrate this element of his prima facie case with respect to Count XIV of his Complaint.

Defendant also argues that Plaintiff has presented no evidence that a similarly situated employee not in his protected class was treated more favorably than Plaintiff with respect to the evaluative comments at issue.  Specifically, Defendant argues that there are no non protected employees similarly situated to Plaintiff.   Similarly situated employees are ones who have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir.1992). In determining whether an allegedly comparable employee is similarly situated, the ultimate question is whether "all of the relevant aspects of [his] employment situation were 'nearly identical' to those of the [comparator's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir.1998); *Clayton v. Meijer*, 281 F.3d 605, 611 (6th Cir.2002).

Plaintiff compares himself to his successor, Charles Newton. (Complaint, ¶¶157, 193, 225). CSU argues that Plaintiff and Mr. Newton are not similarly situated because there is no evidence that Mr. Newton engaged in any of the behavior attributed to Plaintiff in his November 29, 2011 evaluation or had any of the job performance failings that led to Plaintiff's termination. Similarly, there is no evidence that Mr. Newton developed any software applications that would have brought him into any alleged conflict with the Audits of IR departments.  There is no evidence in this record that would indicate that Mr. Newton's conduct or job performance is similar in any relevant way to Plaintiff's. As such, there is no basis to conclude that Mr. Newton has been treated more favorably than Plaintiff.  Accordingly, Plaintiff has failed to demonstrate a prima facie case for these claims.

Moving on to Plaintiff's discrimination claim based upon his "wrongful termination" (Count VI), Defendant asserts that Plaintiff has failed to assert a prima facie case because he has failed to demonstrate that similarly situated employees outside of his protected class were treated better than he.  In his Complaint Plaintiff uses Charles Newton, his successor, and Gayle Schmitz, who Plaintiff alleges worked in the Business Affairs Division headed by Mr. McHenry, as comparators. (Complaint, ¶193). Exhibit 39 to Plaintiff's Response is a Plain Dealer article which states that Gayle Schmitz, was sentenced after pleading guilty to theft in office for stealing money during the course of her employment overseeing the athletic accounts in the treasurer's office. Ms. Schmitz never worked for Ms. Brown in Enrollment Services. (Brown Aff, ¶6).  As explained above, there is no evidence that Mr. Newton's conduct compared in any respect to Plaintiff's, thus the fact that he was not terminated for his poor performance of his job duties does not mean he was treated more favorably.  As for Ms. Schmitz, Plaintiff claims that she was

17

treated better because she was not terminated and was merely put on paid leave when her conduct was discovered and switched to unpaid leave when she was indicted.  Instead, according to Plaintiff  she was able to resign rather than be terminated by CSU.  Regardless of the treatment Ms. Schmitz received, she is not similarly situated to Plaintiff for this analysis. Ms. Schmitz was an employee of a different department, who performed a different function and reported to a different supervisor and thus is not a suitable comparator for Plaintiff.  See *Mitchell*, 964 F.2d 577 at 583. Accordingly, Plaintiff has failed to demonstrate a prima facie case for his discrimination claim based upon his termination. (Count VI).

The last two instances of disparate treatment discrimination alleged by Plaintiff were his claims that CSU failed to hire him for two different positions.[4] In a failure to hire case, a plaintiff establishes a prima facie case of race discrimination by showing that: "(1) he is a member of a protected class; (2) he applied and was qualified for the position at issue; (3) he was considered and denied the position; and (4) other employees of similar qualifications who were not members of the protected class were offered the position." *Hubbard v. Int'l Paper Co.*, No. 2:08–CV–181, 2009 WL 5171825, at *5 (S.D.Ohio Dec. 21, 2009) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir.2000)). CSU does not dispute that Plaintiff has established the prima facie case with respect to the law school position referred to in Count X. Rather, CSU contends that it has  legitimate, non-discriminatory reasons for its decision not to hire Plaintiff for that

---

[4]

While Plaintiff's Complaint is confusing in that both Counts IX and X and Counts XVII and XVIII recite in their first paragraph that Plaintiff's failure to receive the respective positions was an "unlawful retaliation," the Court will presume based on Plaintiff's further reference to disparate treatment and the McDonnell Douglas framework in paragraphs 208 and 243 and the lack of further discussion of retaliation that Plaintiff is asserting claims of disparate treatment discrimination in Counts X and XVIII.

position which Plaintiff has failed to demonstrate are pretexts for discrimination.

With respect to the Director of IR position at issue in Counts XVII and XVIII, Defendant asserts that those claims are barred because none of the claims related to CSU's failure to hire or promote him to the Director of IR were included in his OCRC charge (See ECF #64, Ex.41) and thus are time barred.  An employee alleging employment discrimination in violation of Title VII must first file an administrative charge with the EEOC within a certain time after the alleged wrongful act or acts. See 42 U.S.C. § 2000e-5(e)(1). The charge must be "sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b).  "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." *Younis v. Pinnacle Airlines, Inc*., 610 F.3d, 359, 361 (6th Cir. 2010), citing 42 U.S.C. § 2000e-5(f)(1); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). However, the Sixth Circuit interprets the scope of a charge liberally where the plaintiff was not assisted by counsel in drafting the charge.  *Johnson v. Cleveland City School*, 344 Fed.Appx. 104, 109 (6th Cir. 2009). The filing of a timely administrative discrimination charge is not a jurisdictional prerequisite to a subsequent federal lawsuit, but instead a requirement that is subject to waiver, estoppel, or equitable tolling. *Steiner v. Henderson*, 354 F.3d 432, 434–5 (6th Cir.2003) (citing *Zipes v. Trans World Airlines, Inc*., 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)).

Plaintiff does not address this argument in his Response. Review of Plaintiff's OCRC Charge filed on May 25, 2012, shows that Plaintiff checked the boxes for both failure to hire and failure to promote. He also described his failure to get the position at the law school in his detailed statement of facts.  He does not, however, mention that he was not hired or promoted to

the position of Director of IR. This claim arose while he was employed at CSU, and he captions the claim as "failure to promote" in his Complaint. The factual statement in his charge does not refer to any other instance of a failure to promote. CSU was aware of this claim from Plaintiff's filings with CSU's Affirmative Action Office. As such, CSU will not be prejudiced if the Court declines to dismiss the discrimination and retaliation claims based on Plaintiff's failure to be promoted or hired as the Director of IR on a procedural technicality.

Moving to the issue of whether Plaintiff has demonstrated a prima facie case on this claim, the only element in question would be whether Plaintiff was qualified for the Director of IR position. CSU argues that the search committee assigned to fill the position determined based solely upon Plaintiff's application materials, that Plaintiff did not meet two of the minimum requirements of the position. Specifically, the committee determined that Plaintiff did not have 7 years of experience in research design, quantitative analysis, data collection, data base design, report writing, and evaluation and outcomes assessment, including 3 years at a management or project leadership level and that Plaintiff did not have supervisory experience. (Simple Aff., ¶11). Based on this comparison of Plaintiff's cover letter and CV to the minimum requirements of the position, Plaintiff was one of many applicants who were dismissed from the hiring process at this stage.

Plaintiff's cover letter and CV indicate that he had served as Director of IR at Chancellor University for one year prior to joining CSU. Prior to his work at Chancellor University, Plaintiff's CV indicates that he served as an independent contractor for MIT Affiliate from 2007 to current, and worked as an Assistant or Associate Professor of Information Systems at St. John Fisher College (2004-2008); CWRU (2000-2004); University of Memphis (1998-2000) and

20

Boston University (1996-1998). The Court cannot say with any certainty that the search committee was wrong in determining that the application materials submitted by Plaintiff failed to meet the minimum position requirements although it appears from the face of his CV that he would have obtained at least one year of supervisory experience in his job as IR Director at Chancellor as well as in his Manager position at CSU.  Plaintiff expands on his experience in Exhibit 1 to his Response, but that additional information was not in the hands of the search committee when it made its decision. As such Plaintiff has failed to demonstrate a prima facie case on this claim.[5]

  With respect to Plaintiff's claim that CSU discriminated against him when it failed to hire him for the position at the law school, CSU has offered  legitimate, non-discriminatory reasons for its hiring decision.  CSU acknowledges that Plaintiff was qualified for the job and as such he was asked to interview.  He was not hired because the successful candidate, Daniel Thomas, performed better in the interview as evidenced by his unanimous ranking as the number one choice by the screening committee.  Overall, the search committed determined that Mr. Thomas was the "best fit" for the position.

  Under the burden shifting analysis, it is now up to Plaintiff to demonstrate that CSU's stated, non-discriminatory reason for its hiring decision was a pretext for discrimination.  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's

---

[5]

The fact that Ms. Stimple and the search committee recommended that CSU interview three Asian applicants who met the minimum qualifications for the IR position indicates that the committee did not determine that Plaintiff did not meet the minimum qualifications for the position because of his race.

21

proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp*., 533 F.3d 381, 393 (6th Cir.2008).

In an effort to establish pretext, Plaintiff asserts that he had a superior educational background and technology training experience than Thomas; he had received external recognition of his professional accomplishment and had received good feed back during his interview at the law school. Even assuming that this is all true, Plaintiff does not assert that Thomas was not qualified for the position, just that he believes he was more qualified.  The evidence remains that the search committee invited five qualified applicants to interview. Plaintiff was one of the five.  All five were presumably qualified for the job and the interview process was used to further evaluate and rank the candidates with respect to how they would fit into this particular position at the law school.  Plaintiff has no evidence to rebut the rankings assigned by the search committee or to show that the concerns regarding Plaintiff expressed by the search committee and other members of the law school had no basis in fact. Finally, Plaintiff has offered no rebuttal to the search committee's conclusion that Thomas would be a better fit in the position.  In short, Plaintiff has offered no evidence that CSU's legitimate reasons for hiring Mr. Thomas for the law school Assistant Director of Technology position were actually a pretext for discrimination.

Based upon this record, Defendant is entitled to summary judgment on Plaintiff's claims or race discrimination/disparate treatment. (Counts II,VI, X, XIV, and XVIII)

### 2. Retaliation Claims

Plaintiff alleges that the same actions asserted to be discriminatory were also taken in retaliation for his having engaged in protected activity.  The Counts of the Complaint at issue here are Count I (November 29, 2011 negative review); Count V (Wrongful Termination); Count IX (Failure to Hire for the law school Asst. Dir. Of Technology ); Count XIII (False Accusations Aug. 23, 2011 Dashboard Meeting); and Count XVII (Failure to Hire or Promote to the Director of IR position).

Title VII of the Civil Rights Act of 1964 contains an anti-retaliation provision that provides in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a).  A retaliation claim can be established either through direct evidence of retaliation or circumstantial evidence that would support an inference of retaliation. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir.2010). There is no direct evidence here so Plaintiff proceeds under the *McDonnell Douglas* burden shifting analysis.

To establish a prima facie case of unlawful retaliation under Title VII, the plaintiff must demonstrate by a preponderance of the evidence that: 1) he engaged in activity that Title VII protects; 2) defendant knew that he engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists.  *Abbott v. Crown Motor Company*, 348 F.3d 537, 542 (6th Cir. 2003) (citations omitted.) If the Plaintiff proves the existence of a prima facie case, the burden of production shifts to the defendant to articulate a

legitimate, non-discriminatory reason for the adverse action. *Id.* If the defendant meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action. *Id.* citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). If the plaintiff demonstrates that the defendant's proffered, non-discriminatory reason is a pretext, then the fact finder may infer unlawful retaliation. *Id.* (citations omitted). Throughout the entire *McDonnell Douglas* framework, the plaintiff bears the burden of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Defendant asserts that Plaintiff has failed to state a prima facie case of retaliation under Title VII with respect to his claims involving CSU's evaluative comments about his work performance (Counts I and XIII) because the evaluative comments do not constitute an adverse employment action. These arguments are essentially the same as the arguments made with respect to Plaintiff's disparate treatment claims regarding the evaluative comments. For the reasons set forth above, Plaintiff has demonstrated that the November 29 performance review which was directly cited in his letter of termination constitutes a materially adverse employment action under Sixth Circuit precedent. The alleged false accusations made during the August 23, 2011 Dashboard meeting do not constitute a materially adverse employment action.

Defendant also argues that Plaintiff fails to demonstrate a prima facie case in any of his Retaliation claims because there is no causal connection between any protected activity and the materially adverse action. In order to demonstrate the causal connection element of his prima

24

facie case of retaliation, Plaintiff  "must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had Plaintiff not filed a discrimination action." *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir.1999) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir.1984)).

Defendant asserts in line with some older Sixth Circuit precedent that temporal proximity alone cannot establish a causal connection. See e.g. *Spengler*, 615 F.3d at 494. However, as the Sixth Circuit has emphasized,  temporal proximity always plays a role in establishing a causal connection; and its significance depends on the context. In now seems fairly well established that:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, 675 (6th Cir. 2013) citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008) (In *Mickey* the Plaintiff was terminated 1 day after filing his charge and that extreme temporal proximity satisfied the causal connection element of Plaintiff's prima facie case.) See also *McNett v. Hardin Cmty. Fed. Credit Union*, 118 Fed.Appx. 960, 965 (6th Cir.2004) (finding causation when "only 13 days" separated protected activity from adverse action, reasoning that an "employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation where the

25

particular circumstances strengthen the inference of causation"); *Shefferly v. Health Alliance Plan of Michigan*, 94 Fed.Appx. 275, 285 (6th Cir.2004) (stating that "the passage of less than three weeks between [the employer's] receipt of the charges and the adverse actions gives rise to an inference of discrimination" and "[t]herefore, in this case, [the plaintiff] has established a prima facie case of retaliation"); *but see Mallory v. Noble Corr. Inst*., 45 Fed.Appx. 463, 472-73 (6th Cir.2002) (6 months is too long to establish causal connection.)

The materially adverse actions at issue in Plaintiff's claims are his November 29, 2011 negative performance review, his termination on February 9, 2012, the failure to hire him for the law school job which he applied for on February 20, 2012, interviewed for on March 6, 2012 and learned he did not get on May 14, 2012; and failure to hire/promote to Director of IR which CSU asserts he was eliminated from contention in June 2011 and Plaintiff states he was notified of his rejection on September 13, 2011.[6]

Plaintiff's protected activities took place on :

May 13, 2011, (comments at a meeting regarding audit procedures);

August 23, 2011, (Plaintiff sent email to Ms. Richards and others summarizing his recollection of the Aug.23 Dashboard Meeting in which he notes that he expressed his concern that the Audit practice stay within the requirements of Title VII);

August 25, 2011, Plaintiff met with CSU EEO investigator Codinach to complain about

---

[6]

While the Court determined that the August 23, 2011 "false accusations" were not a materially adverse employment action," there does not appear to be any protected activity in prior "acutely close" proximity.  Plaintiff's assertion that he made some comment about Audit requirements acting to exclude certain minorities in a May 13, 2011 meeting does not constitute a protected action and in any event, is more than 3 months distant which is on the very outside of what might be called extreme temporal proximity.

26

alleged discrimination on the part of CSU employees Janet Stimple, Ms. Richards and Mr. Petrus.

October 25, 2011, Plaintiff alleges he met with his Supervisor Brown to tell her that he had been retaliated against for filing the August 25, 2011 complaint; and

November 23, 2011, Plaintiff filed formal complaint with CSU Affirmative Action Office.

All of the adverse actions and the protected activities took place within a one year time frame and most of the adverse actions have a protected activity within the prior month. The negative performance review was given less than 3 months after Plaintiff complained to the CSU EEO investigator on August 25, 2011 and less than 3 weeks after Plaintiff states that he complained to Ms. Brown about the alleged retaliation he had encountered following the filing of his complaint on August 25.  This time frame meets the "extreme temporal proximity" criteria.

Plaintiff's termination on February 9, 2012, occurred less than 3 months following Plaintiff's formal written complaint to the CSU Affirmative Action Office and fits within the "extreme temporal proximity" criteria.

Plaintiff learned he did not get the Assistant Director of Technology position at the law school on May 14, 2012 after having interviewed for the position on March 6, 2012.  Plaintiff's last protected activity occurred on November 23, 2011. There is about 4 months between these activities and thus, the Court finds in these circumstances that the temporal proximity is not sufficiently extreme to create an inference of causation without other evidence of retaliatory conduct. In any event, the hiring manager has filed a sworn affidavit that she had no knowledge

27

of Plaintiff's protected activity and Plaintiff has failed to provide any evidence that would suggest anyone who was involved in the hiring process for this position knew about the protected activity. As such, Plaintiff has failed to demonstrate a prima facie case of retaliation for his failure to be hired in this position.[7]

Finally, Plaintiff learned that he did not get the Director of IR position on September 13, 2011. He filed his first complaint with the CSU EEO Office on August 25, 2011. However, CSU asserts that Plaintiff was eliminated from consideration for the position in mid June when the search committee determined that he did not meet 2 of the minimum qualifications. There is no evidence that the search committee's finding regarding Plaintiff's lack of the minimum qualifications for the position was based on Plaintiff's race. Defendant asserts that Plaintiff did not engage in any protected activity before August 25, 2011 and that there is no competent evidence to support his contention that he undertook some protected activity in the May 13, 2011 meeting. In any event, CSU notes that there is no evidence that Janet Stimple and the search committee for the IR Director position knew about any protected activity or complaint made by Plaintiff before he was eliminated from consideration for the IR position in June. CSU's arguments in this regard are well taken and Plaintiff fails to assert a prima facie case of retaliation for the failure to hire or promote him to Director of IR.

Moving on to the next step of the burden shifting analysis, CSU has set forth  legitimate, non-discriminatory reasons for the giving Plaintiff a negative performance review and for

---

[7]

Even if Plaintiff had established a prima facie case, it is clear as discussed in Plaintiff's disparate treatment claim based on the same conduct, that Plaintiff has offered nothing to demonstrate that CSU's legitimate, non-discriminatory reasons for its hiring decision with respect to this position were a pretext for discrimination.

28

terminating his employment. CSU notes that Plaintiff's performance was poor in the following respects:

–Delegating to the IR Division tasks that Ms. Brown specifically assigned to him;

–Taking more than 4 weeks to complete an FTIC report for Ms. Brown, forcing Ms. Brown to cancel production of the report;

–Providing Ms. Brown with reports generated by a separate division of CSU rather than generating the report in the manner and format Ms.Brown requested;

–Being unable to generate an admissions report for Ms.Brown in the format she requested, which required that the project be cancelled;

–Failure to take a leadership role in implementing new technology within the Division of Enrollment Services;

–Delaying transfer of the Dashboard to IR;

–Continued failure to provide Ms. Brown with reports in the format she requested and with the information she requested; and

–Plaintiff's inability to provide Ms.Brown with specific enrollment statistics she needed upon request.

Carmen Brown avers that the substance of Plaintiff's November 29, 2011 evaluation is accurate and was made based upon her first hand experiences with Plaintiff's work performance. She states that she did not consider Plaintiff's race, and race was not a factor in the evaluation. Further, she asserts that Plaintiff's August 25, 2011 complaint to CSU's Director of Affirmative Action was not a factor in the evaluation and that she did not know that Plaintiff had filed a formal complaint with Donna Whyte, CSU's Interim Director of Affirmative Action when she

drafted the evaluation. (Brown Aff., ¶23) Plaintiff's performance did not improve subsequent to his evaluation. Brown states that the decision to terminate Plaintiff's employment was based solely upon his poor work performance and that his complaints to the Affirmative Action Office about being treated unfairly were not considered in the termination decision. (Id. at ¶27)

Having established non-discriminatory, legitimate reasons for Plaintiff's poor evaluation and discharge, the burden is on Plaintiff to show that Defendant's reasons are actually a pretext for discrimination.  "To establish pretext, a Plaintiff must show that an employer's stated reason: (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) was insufficient to explain the challenged conduct." *Simpson v. Vanderbilt Univ*., 359 F. App'x 562, 569–70 (6th Cir.2009) (citation omitted). To meet this burden, a plaintiff must present " 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.' " *Id*. (citations omitted). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr., supra* 509 U.S. 502 at 515–16; see also *Simpson*, 359 F. App'x at 570; *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530–31 (6th Cir.2012) (stating that, to establish pretext, "the employee also must offer some evidence that not only were the employer's reasons false, but that retaliation was the real reason for the adverse action").

Here Plaintiff states that he produced some reports to Brown or submitted parts of reports and requested input from Brown which he never received and was thus unable to complete some reports. He also states that he was willing to work on the OnBase and Hobsons projects but he was excluded by Janet Stimple or the some other CSU department head. Plaintiff does not

address Ms. Brown's concerns that he was delegating tasks to the IR Division that she had

specifically assigned to him or that Ms. Brown was forced to cancel production of a report that

she had requested after the request languished for more than 4 weeks or that he did not generate

reports in the format requested by Ms.Brown.  It appears from emails submitted with the parties'

filings that Plaintiff's attempts to get some reports generated in whole or part by other

departments at CSU resulted in some back and forth emails between employees and managers in

other departments which eventually included Ms. Brown.  Ms. Brown notes that her job requires

her to have ready access to student enrollment data to make quick decisions in an effort to

maximize enrollment at CSU.  The data she requested on a daily basis is unofficial data and is

intended solely for the use by the Division of Enrollment. (Brown Aff., ¶ 2) Plaintiff does not

dispute that Ms. Brown repeatedly asked him to generate the reports she requested.  Plaintiff

does not dispute that he continued to provide Ms. Brown with reports generated by other

divisions rather than generate them himself.  While CSU does not contend that Plaintiff failed to

provide any reports, the crux of the claim is that he did not generate certain specific reports that

Ms.Brown had requested and Ms.Brown was forced to cancel certain requests and that he did not

follow the requests as specifically given to him by his supervisor.

CSU notes that Plaintiff's assertion that he was excluded from the OnBase and Hobsons

projects highlights his failure to provide leadership as a manager since Ms. Stimple had no

power to assign Plaintiff job duties or to exclude him from any projects.

In short, it appears that the statements in the November 29, 2011 evaluation were

accurate and that Plaintiff's performance did not improve resulting in his termination of his

probationary employment. The Plaintiff has failed to demonstrate that the reasons proffered by

31

CSU for the performance evaluation and termination were insufficient to motivate or explain those decisions. Most critically, Plaintiff has not offered any evidence that discrimination or retaliation was the real reason for his poor review and termination.[8] As such Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

### 3. Hostile Work Environment

Defendant asserts that Plaintiff's claims of discriminatory and retaliatory Severe and Pervasive Harassment (Counts XXI and XXII) fail as a matter of law because there is no evidence of severe and pervasive harassment.

Title VII offers employees protection from a "workplace [ ] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment...." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations and quotation marks omitted). The touchstone of any hostile work environment claim, and the main element at issue for both hostile work environment claims presented here, is whether "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' *Khamati v. Sec'y of the Dep't of the Treasury*, No. 13-1265,

---

[8]

As soon the IR and Audit departments started questioning the security of the Dashboard that Plaintiff created, he has been attributing all questions, no matter how necessary or benign, to the questioner's purported racism. Given the volumes of emails and complaints generated by Plaintiff about almost everything requested of him, it appears that working with him was an exhausting process. However, the number of complaints and cries of racism generated by a plaintiff does not protect him from being held responsible for doing his job in the manner required by his employer. It is clear from the evidence submitted in this case, that despite his numerous cries of racism, racism play no part in CSU's evaluation and termination of Plaintiff.

2014 WL 563263 at *8 (6th Cir. Feb. 13, 2014) citing *Harris*, 510 U.S. at 21. We consider "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *Harris,* 510 U.S.  at 23. "Conduct that is not severe or pervasive

enough to create an objectively hostile or abusive work environment-an environment that a

reasonable person would find hostile or abusive-is beyond Title VII's purview ... [l]ikewise, if

the victim does not subjectively perceive the environment to be abusive, the conduct has not

actually altered the conditions of the victim's employment, and there is no Title VII violation."

*Id.* at 21-22; see also *Jackson v. Quanex Corp*., 191 F.3d 647, 658 (6th Cir.1999)

           In order to determine whether an environment is 'hostile' or 'abusive' a court must look

at all the circumstances." *Harris*, 510 U.S. at 23. Courts must consider "harassment 'by all

perpetrators combined,' rather than 'divid[ing] and categoriz[ing] the reported incidents.'

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir.1999). However, . . .only harassment

based on the plaintiff's protected status [race] or performance of protected activities may be

considered. *Williams v. CRX Transp. Co. Inc*., 643 F.3d 502, 511 (6th Cir. 2011) (citations

omitted.); *Khamati*, 2014 WL 563263 at *8. The question before the Court is whether the totality

of Plaintiff's race-based or retaliatory harassment was "sufficiently severe or pervasive to alter

the conditions of his employment and create an abusive working environment." *Harris*, 510 U.S.

17, 21.  Factors to consider include "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Id*. at 23. Significantly, "isolated

incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and

33

conditions of employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Occasional offensive utterances do not rise to the level required to create a hostile work environment. *Grace v. USCAR*, *513 521 F.3d 655, 679 (6th Cir.2008). "To hold otherwise would risk changing Title VII into a code of workplace civility, a result we have previously rejected." *Id.* (internal quotation marks omitted).

Plaintiff asserts he was subjected to threats and false accusations that created a hostile work environment. Specifically, Plaintiff contends that the following actions amounted to severe and pervasive retaliatory harassment:

–threat to remove Plaintiff's database access;

–request to remove and search Plaintiff's office computer;

–requiring Plaintiff to work 60-70 hours per week;

–required to submit time sheets;

– accusation that Plaintiff was responsible for not providing reports for Gone-but-not-forgotten project;

–questioning the security of his Dashboard application; and

–accusation that Plaintiff delayed transfer of Dashboard to IR

While CSU has offered evidence and explanations or denials for these actions, it argues that even if they were all true, all of the allegations of harassment are facially neutral and do not objectively indicate harassment on the basis of race or in retaliation for protected activity.  Most importantly, they are not sufficiently severe and pervasive to create an intolerable working environment. See, e. g. *Faragher*, 524 U.S. 775, 806.  The Court has no doubt that Plaintiff found elements of his work environment stressful and disagreeable.  However, Plaintiff has

34

failed to provide any proof beyond bare assertions of a causal connection between his race and his work atmosphere and any persuasive proof beyond temporal proximity and speculation of a causal connection between his protected activities and his work atmosphere. Based upon the competent evidence in this record and viewing the circumstances in their totality, the Court finds that any "race based" or retaliatory harassment was not sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claims.

## CONCLUSION

For the reasons set forth above, the Court finds that there are no genuine issues of material fact involving Plaintiff's remaining claims and that Defendant is entitled to judgment as a matter of law on those claims. Accordingly, Defendant's Motion for Summary Judgment (ECF #64) is granted.


  _/s/Donald C. Nugent_
DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE

DATED:  June 11, 2014